UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Nº 04 Civ. 8393 (RJS)

---

MICHAEL BAGUER,

Plaintiff,

VERSUS

SPANISH BROADCASTING SYSTEM, INC.,

Defendant.

---

OPINION AND ORDER
July 12, 2010

---

RICHARD J. SULLIVAN, District Judge:

Plaintiff Michael Baguer brings this action against his former employer, Spanish Broadcasting System, Inc. ("SBS"), alleging that SBS (1) unlawfully terminated him for discriminatory reasons and (2) failed to pay him commissions earned prior to his termination. Specifically, Plaintiff alleges that he was discriminated against on the basis of his race, national origin, and age in violation of Title VII, the Age Discrimination in Employment Act ("ADEA"), and New York State and City law. Plaintiff also brings several state law claims to recover commissions he alleges were due and owed to him, but never paid.

Before the Court is Defendant's motion for summary judgment on all claims. For the reasons set forth below, the Court grants Defendant's motion for summary judgment.

I. BACKGROUND

A. Facts[1]

1. Parties

Plaintiff was born in Cuba on September 29, 1951 and considers himself a "brown skinned hispanic." (Decl. of Michael Baguer ("Baguer Decl.") ¶ 6.) He began

---

[1] The following facts are taken from Defendant's Local Rule 56.1 Statement as well as other documents in the record. Where only Defendant's Rule 56.1 statement is cited, Plaintiff does not dispute that fact or has offered no admissible evidence to controvert that fact.

work in television-advertising sales in 1977 and eventually moved to radio-advertising sales. (*Id.* ¶ 10.) Plaintiff specialized in selling to advertisers that specifically target the Hispanic market. (*Id.*)

SBS is a Delaware corporation that owns and operates twenty Spanish-language radio stations, including two in the New York City area, WSKQ-FM and WPAT-FM (collectively "SBS New York"). (Def.'s 56.1 ¶ 1.) Pablo Raúl Alarcón, a Cuban-born immigrant, founded SBS in 1983. (Serritella Decl. Ex. CC.) Raúl Alarcón, Jr., also a Cuban immigrant, is SBS's Chairman of the Board, Chief Executive Officer, and President. (*Id.*) In addition to Alarcón Jr., four of SBS's six directors are Cuban. (*Id.*) In 2000, more than 88% of the full-time employees, including senior management, of SBS New York were Hispanic. (Def.'s 56.1 ¶ 3.)

Around the time Plaintiff started at SBS in 1996, Luis Alvarez became the local sales manager for SBS New York and thus Plaintiff's direct supervisor. (Def.'s 56.1 ¶ 12.) In 2001, Alvarez was promoted to General Sales Manager but continued to supervise Plaintiff. (*Id.*) Alvarez was born in the United States but is Hispanic and of Cuban descent. (Aff. of Jordan B. Schwartz ("Schwartz Aff.") Ex. 2 (Dep. Tr. of Luis Alvarez ("Alvarez Dep. Tr.")) at 146:6-11.) Alvarez was 45 years old when Plaintiff was terminated in July 2003. (Def.'s 56.1 ¶ 14.)

Alvarez reported to Carey Davis, SBS New York's General Manager, and Maria Elena Llansa, SBS Vice President of Sales. (*Id.* ¶ 16.) Davis is white, non-Hispanic, and was 49 years old when Plaintiff was terminated. (*Id.* ¶ 17.) Llansa is of Cuban descent and was in her forties in 1997 (*id.* ¶ 18), so was therefore in her late forties or early fifties when Plaintiff was terminated.

In 2003, Llansa left SBS New York for SBS's corporate headquarters in Miami. (*Id.*)

When Alvarez became General Sales Manager, Philip Estevez became the Local Sales Manager at WSKQ and thus Plaintiff's direct supervisor. (Def.'s 56.1 ¶ 13.) Before becoming Local Sales Manager, Estevez had been an account executive ("AE") alongside Plaintiff and was friends with Plaintiff. (*Id.*) Estevez left SBS in June 2003, about one month prior to Plaintiff's termination. (*Id.*) Estevez is Hispanic and of Dominican descent. (Def.'s 56.1 ¶ 15.)

2. Plaintiff's Employment with SBS

SBS hired Plaintiff as an AE in January 1996. (*Id.* ¶ 4.) As an AE, Plaintiff was responsible for selling advertising by building and maintaining relationships with existing and potential clients. (Schwartz Aff. Ex. 1 (Dep. Tr. of Michael Baguer ("Baguer Dep. Tr.")) at 37:6-25.) Plaintiff was an at-will employee (Def.'s 56.1 ¶ 6) and received commissions on advertising sold, credited against a fixed monthly draw (Baguer Decl. ¶ 192). Plaintiff was never promoted but eventually earned the informal title of Senior Account Executive as he gained more seniority at SBS. (Def.'s 56.1 ¶ 11.)

a. JL Media

When Plaintiff started working at SBS, he sold advertising for both SBS New York stations. (Baguer Decl. ¶ 12.) In the spring of 1998, Alvarez assigned Plaintiff to one of SBS New York's largest accounts, JL Media. (*Id.* ¶ 20.) JL Media was Plaintiff's principal account and one of the most important that he handled. (Def.'s 56.1 ¶ 59.) Nevertheless, although Plaintiff

successfully grew the JL Media account after taking over (Baguer Decl. ¶ 24), JL Media's president, Gerald Levy, personally complained to Alvarez on several occasions about Plaintiff's servicing of the JL Media account. (Def.'s 56.1 ¶ 61.) Levy was 67 years old when Plaintiff was terminated. (*Id.* ¶ 56.)

Eventually, Levy testified that he requested that Plaintiff be "removed as the salesperson calling on JL Media." (Schwartz Aff. Ex. 8 (Dep. Tr. of Gerald S. Levy ("Levy Dep. Tr.")) at 10:20-22.) Levy also characterized Plaintiff as "incompetent" (*id.* at 9:24-10:1) and complained that Plaintiff "couldn't get anything correct" (*id.* at 10:13).

Although Plaintiff disputes Levy's characterization, he acknowledges that shortly before his termination there were a number of administrative problems with the JL Media account that resulted in, among other issues, ads that JL Media had purchased not being run. (Baguer Decl. ¶¶ 221, 225-38.)

### b. The Account Split

Until 2003, all AEs managed and serviced accounts for both WPAT and WSKQ. (Baguer Dep. Tr. at 67:17-68:14). In 2003, management split the accounts so that each AE only sold for one of the stations. (*Id.*; Alvarez Dep. Tr. at 80:25-81:25; Schwartz Aff. Ex. 6 (Dep. Tr. of Philip Estevez ("Estevez Dep. Tr.")) at 105:9-15.) The decision to split the sales force was designed to increase sales and was made by the entire management team at SBS New York, although Alvarez was primarily responsible. (Def.'s 56.1 ¶ 71.)

After SBS New York received approval to split the sales force, Davis, Alvarez, and Estevez decided how to divide the AEs between the two stations. (*Id.* ¶ 75.) They assigned Plaintiff to WSKQ. (*Id.* ¶ 83.)

In August of 2002, before it had finalized the split, SBS divided the JL Media account, leaving the WSKQ portion with Plaintiff and assigning the WPAT portion to Blanche Josten. (Baguer Dep. Tr. at 82:17-83:2.) The WSKQ portion of the account represented the majority of JL Media's business with SBS. (Def.'s 56.1 ¶ 78.)

After the sales split, Plaintiff continued to service his preexisting WSKQ accounts, and SBS assigned him new accounts in an attempt to make up for the billings he lost on WPAT accounts. (*Id.* ¶ 80.) However, some of the "make up" accounts assigned to Plaintiff did not materialize, as the clients either went out of business or significantly decreased their amount of advertising. (*Id.* ¶ 82.) Plaintiff asserts that, in spite of this, he continued to meet his overall sales goals. (Baguer Decl. ¶¶ 135-46.)

### c. Plaintiff's Work Performance

In 2001, Plaintiff was successful in attracting new business and received several congratulatory emails from his supervisors. (*E.g.*, Serritella Decl. Exs. 6-9.) In the first quarter of 2003, however, Estevez prepared a review of AEs that described Plaintiff as a "disappointment and clearly one of our problem areas." (Schwartz Aff. Ex. 25.) Estevez went on to state that Plaintiff "has a bad attitude" and "is bad for the moral [sic] of the team." (*Id.*) Estevez's report for the second quarter of 2003 similarly indicated that Plaintiff was "underperforming" and "suffering from a lack of effort." (Schwartz Aff. Ex. 28.)

Wanda Mercado and Carol Higginbotham Rose, two of Plaintiff's

3

former co-workers, both stated that they believed Plaintiff to be an "excellent salesperson at SBS." (Decl. of Wanda Mercado ("Mercado Decl.") ¶ 25; Decl. of Carol Higginbotham Rose ("Rose Decl.") ¶¶ 20, 34.) Nevertheless, Davis testified that in meetings Plaintiff had expressed disagreement with the requirement that he generate new business and "had a bad attitude about it." (Davis Dep. Tr. at 71:18-72:11.) Davis also described several instances where Plaintiff made negative gestures and reactions during sales meetings and reported that Plaintiff's direct managers, Estevez and Alvarez, had complained to Davis about Plaintiff's bad attitude on several occasions. (*Id.* at 144:13-147:2.)

### d.   New Clients

According to Plaintiff's supervisors, new advertising business is the "lifeblood of radio." (*Id.* at 83:8-13.) In fact, "40 percent of radio [advertising] every year are new clients who have never been there before." (*Id.*) Plaintiff and other former employees acknowledged that new business was a "goal," but contended that "[o]verall sales was the most important number in judging performance of account executives at SBS." (Mercado Decl. ¶ 54; *see also* Baguer Dep. Tr. at 50:17-20 ("[I]n any sales decision . . . you're going to have attrition and you need to replace that business as you lose it along the way.").)

In an effort to help Plaintiff attract new business, Davis testified that the two met on numerous occasions to discuss ways Plaintiff could improve on seeking and obtaining new clients, an area in which Plaintiff was "weak." (Davis Dep. Tr. 77:16-22; 147:15-22.) In contrast, Mercado testified that "she did not believe [it] to be the case" that Plaintiff failed to secure sufficient new business. (Mercado Decl. ¶ 26.) Rose similarly testified that "I believe Michael Baguer was an excellent salesperson at SBS. He was concerned about both maintaining and growing his existing accounts, and developing new business. I believe that his overall performance numbers reflect this." (Rose Decl. ¶ 34.) Of course, neither Mercado nor Rose ever supervised Plaintiff in any capacity.

After September 11, 2001, "advertising expenditures took a dive across the industry." (Baguer Dep. Tr. 54:1-22.) On January 8, 2002, Plaintiff sent an email, at his supervisor's request, to Alvarez setting forth his goals and objectives for the upcoming year. The resolutions were to "[d]evelop $300,000 in new business," "[m]aximize existing business," and "[c]ontinue to forge strong partnerships with my clients." (Schwartz Aff. Ex. 13 (emphasis omitted).) In 2002, however, Plaintiff could only recall bringing in one new client, the New Jersey Lottery, which accounted for $60,000 to $70,000 in gross revenue. (Baguer Dep. Tr. 52:21-53:6.)

The following year, 2003, was also a difficult time for the radio broadcast industry. (Def.'s 56.1 ¶ 28.) On January 27, 2003, Estevez sent AEs at SBS New York, including Plaintiff, a memorandum stating that "[n]ew business will play a major role in our success in 2003. Although I've given you a new business goal, it should represent between 15%-35% of your total billing depending on your level of experience and number of years with the company." (*Id.* ¶ 29.) Estevez and Plaintiff soon after met to discuss the memorandum. (*Id.* ¶ 30.)

In January 2003, new sales accounted for 20% of Plaintiff's business. (Baguer Decl. ¶ 60.) However, new sales were only 16.6% of Plaintiff's business in February.

4

(*Id.* ¶ 67.)  In March and April, Plaintiff's new sales were only 12.6% and 11% respectively.  (*Id.* ¶¶ 68, 101.)  New business for May hovered at approximately 11%. (*Id.* ¶ 133.)  For June, Plaintiff asserts that new sales accounted for 33.2% of his business, but included in that calculation are sales from Max Connection and Margeotes — accounts Plaintiff listed as new business for May.  (*Id.* ¶¶ 133, 136.)

In addition to requiring that new business make up a certain percentage of Plaintiff's total sales, SBS also required that Plaintiff bring in three new accounts in May 2003.  (Baguer Dep. Tr. at 134:17-135:4.)  SBS's review of AEs for the second-quarter of 2003 suggested that Plaintiff be let go if he did not meet this goal.  (Schwartz Aff. Ex. 28.)

### 3. Plaintiff's Termination

Plaintiff was fired on July 18, 2003, at the age of 51.  (Baguer Decl. ¶¶ 6, 151).  Alvarez and Davis made the decision to terminate Plaintiff.  (Alvarez Dep. Tr. at 147:4-17; Davis Dep. Tr. at 108:22-109:2.)  Although he left SBS before Plaintiff was terminated, Estevez was involved in discussions about Plaintiff's performance and, in his second-quarter review of AEs, suggested that Plaintiff be terminated if he did not generate sufficient new business.  (Estevez Dep. Tr. at 251:16-23; Schwartz Aff. Ex. 28.)

Davis stated in an email to Julie Dominguez, the comptroller for SBS New York, that "Plaintiff will be terminated from SBS due to poor performance."  (Schwartz Aff. Ex. 38.)  SBS's response to an inquiry from the United States Equal Employment Opportunity Commission also stated that Plaintiff was terminated for unsatisfactory performance and specifically referenced complaints from JL Media and Plaintiff's failure to generate the requisite amount of new business.  (Serritella Decl. Ex. CC.)

Plaintiff acknowledges that SBS's policy was to pay commissions for thirty days after employees left SBS.  (Baguer Dep. Tr. at 209:2-10; Schwartz Aff. Ex. 39.)  Plaintiff acknowledges that he received thirty days of commissions.  (*Id.* at 209:11-16.)

### B. Procedural History

Plaintiff filed this lawsuit on October 25, 2004, and it was assigned to the Honorable Kenneth M. Karas, District Judge.  Plaintiff filed an amended complaint on January 10, 2005, and Defendants moved to dismiss counts nine, ten, and thirteen of the amended complaint.  Judge Karas granted Defendant's motion to dismiss counts nine and ten and partially granted Defendant's motion to dismiss count thirteen.  Judge Karas dismissed count thirteen with respect to the reallocation of Plaintiff's accounts but denied it with respect to Plaintiff's claim for commissions.  *See Baguer v. Spanish Broad. Corp., Inc.*, No. 04 Civ. 8393 (KMK), 2007 WL 2780390 (S.D.N.Y. Sept. 20, 2007).

The case was reassigned to my docket on September 4, 2007 (Doc. No. 21) and on October 9, 2009, after the conclusion of discovery, Defendant filed a motion for summary judgment.  The motion became fully submitted on December 28, 2009.  Thereafter, Plaintiff filed a motion to "permit the supplementation of record and brief in opposition to defendant's motion for summary judgment" based on new documents he discovered inside his home.  The Court denied Plaintiff's motion by order dated January 11, 2010.  (Doc. No. 69.)

## II. DISCUSSION

### A. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *accord Anderson*, 477 U.S. at 248. As such, "if there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted) (alteration in original).

### B. Race and National-Origin Claims

#### 1. Applicable Law

Because Plaintiff has not presented any evidence directly reflecting discriminatory animus, the Court will review Plaintiff's discrimination claims under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005). This same analysis also applies to Plaintiff's parallel claims under New York state law. *See Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 n.3 (N.Y. 2004). After the Second Circuit's opinion in *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268 (2d Cir. 2009), Plaintiff's claims under New York City Human Rights Law ("NYCHRL") will be analyzed separately.

In the first step of this framework, the employee bears the burden of producing evidence sufficient to support a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "*de minimis*." *See, e.g.*, *Woodman*, 411 F.3d at 76; *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001). To establish a *prima facie* case of discrimination, a plaintiff must show (1) membership in a protected class, (2) qualification for the position, (3) an adverse employment action, and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir. 2000).

Second, once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996). At this step, however, a "defendant need not persuade the court that it was actually motivated by the proffered reason." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Rather, a "defendant must clearly set forth, through the introduction of admissible evidence, the

6

reasons for the plaintiff's [termination]." *Id.* at 255.

Third, if the defendant articulates a nondiscriminatory explanation for the action, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Burdine*, 450 U.S. at 253). To create a material issue of fact and defeat a motion for summary judgment, however, a plaintiff is required to "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks omitted). In determining whether the articulated reason for the action is a pretext, "a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable. Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action." *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 170-71 (2d Cir. 1993).

### 2. *McDonnell Douglas* Applied

For the reasons set forth below, the Court grants Defendant's motion for summary judgment as to Plaintiff's federal and state race and national-origin discrimination claims.

#### a. Step One: *Prima Facie* Case

The parties do not dispute that Plaintiff is a member of a protected class and that he suffered an adverse employment action when he was terminated. (Def.'s Mem. at 6.) Therefore, with regard to his race and national-origin discrimination claims, Plaintiff satisfies the first and third prongs of the *prima facie* showing required under *McDonnell Douglas*.

The Court also concludes that Plaintiff was qualified to hold the AE position, thus satisfying the second prong of the *McDonnell Douglas* inquiry. The Second Circuit has cautioned that "the qualification prong must not be interpreted in such a way as to shift into a plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001). Plaintiff began working in broadcast advertising sales in 1977 and worked as an AE for SBS for nearly seven and a half years before being terminated in July 2003. (Baguer Decl. ¶¶ 10, 11, 151; Def.'s 56.1 ¶¶ 4, 92.) Plaintiff's tenure as an AE with SBS establishes that he was qualified to hold the position. *Cf. Slattery*, 248 F.3d at 92 (noting that "where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw").

For the purposes of this motion, the Court also concludes that Plaintiff met his burden of establishing a *prima facie* showing that he was terminated under circumstances that create an inference of discrimination. "[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis." *Zimmermann*, 251 F.3d at 381. While Plaintiff has not presented overwhelming evidence to suggest that SBS terminated him under circumstances giving rise to an

7

inference of discrimination, his replacement, Gina Golden, is an African-American woman and not a member of Plaintiff's protected class. (Def.'s 56.1 ¶ 99.) Therefore, the Court finds that Plaintiff has established a *prima facie* case of discrimination.

b.  Step Two: Non-Discriminatory Reasons for Plaintiff's Termination

The Court finds that Defendant has carried its burden of articulating legitimate and nondiscriminatory reasons for terminating Plaintiff, thus satisfying the second prong of the *McDonnell Douglas* framework.

Defendant has submitted evidence that JL Media, one of his principal clients, was displeased with Plaintiff and requested that SBS assign a different AE to its account. (Def.'s 56.1 ¶¶ 61-64;[2] Alvarez Dep. Tr. at 42:25-44:8; Levy Dep. Tr. at 9:15-10:1, 92:17-94:17.) Unsatisfactory performance is a sufficient nondiscriminatory reason for terminating an employee. *See, e.g.*, *Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 352 (S.D.N.Y. 2009); *Robles v. Argonaut Rest. & Diner, Inc.*, No. 05 Civ. 5553 (JSR), 2009 WL 3320858, at *6 (S.D.N.Y. Oct. 9, 2009). Therefore, the Court finds that SBS has met its burden of articulating a nondiscriminatory reason for terminating Plaintiff based on the complaints from JL Media.

Additionally, Defendant asserts that Plaintiff's performance was unsatisfactory because he failed to bring in the requisite amount of new business, including the three new accounts he was told he must bring in during May 2003. Plaintiff acknowledges that it was important to attract new business and, specifically, that he was required to bring in three new accounts in May of 2003. (Def.'s 56.1 ¶ 7; Baguer Dep. Tr. at 134:17-135:4.) He failed to do so. In addition to bringing in those three accounts, SBS also required that new business make up between 15 and 35% of its AEs' total billing depending on their level of experience and time at SBS. (Def.'s 56.1 ¶ 29-31.) Plaintiff did not meet these new-business-development goals. With the exception of January, February, and June,[3] where Plaintiff's new business accounted for, respectively, 20%, 16%, and 22% of his total sales, Plaintiff's new business never accounted for more than 15% of his total sales in 2003. (Baguer Decl. ¶¶ 62, 66-68, 101, 133, 135-36, 144.) SBS has therefore satisfied its burden of production at this stage and established legitimate and nondiscriminatory reasons for terminating Plaintiff.

c.  Step Three: Pretext

The Court finds that Plaintiff has failed to create a material issue of fact as to

---

[2] Although Plaintiff disputes these portions of Defendant's 56.1 statement and claims that all of these allegations present genuine issues of material fact, he does not cite to anything that rebuts or casts doubt on the extensive deposition testimony upon which Defendant relies. The declarations from Mercado and Rose, Plaintiff's former co-workers, state that they were unaware of any complaints from JL Media about Plaintiff's performance but do not contradict Levy's statements that he was unhappy with Plaintiff or that he had complained about him to SBS.

[3] As discussed above in Part I.A.2.d, Plaintiff claims that new business accounted for 33.2 percent of his total business that ran in June of 2003, counting Center Car, Fulton Street, Max Connection, Margeotes, and the United States Air Force. (*See* Baguer Decl. ¶ 136.) He admits, however, that both Max Connection and Margeotes first ran in May and were sold even earlier. (*Id.* ¶ 133.) Thus, assuming the rest of Plaintiff's claimed new business was in fact new, he sold 22 perecent new business in June.

8

whether SBS's rationale for terminating him was a pretext for discrimination.

### i. Plaintiff's Job Performance

Plaintiff's argument that he performed his job well does not create a material question of fact as to whether SBS's asserted reasons for his termination were pretextual. Although Plaintiff argues that JL Media's complaints were unfounded, "plaintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim." *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999); *see also Dorfman v. Doar Commc'ns Inc.*, 314 F. App'x 389, 391 (2d Cir. 2009) (affirming grant of summary judgment where "evidence of [plaintiff's] unsatisfactory work performance constituted a legitimate nondiscriminatory reason for [plaintiff's] termination, one that [plaintiff] failed to undermine as illegitimate or pretextual"). Additionally, it is not this Court's function "to second-guess business decisions regarding what constitutes satisfactory work performance." *Soderberg v. Gunther Int'l, Inc.*, 124 F. App'x 30, 32 (2d Cir. 2005).

Here, the only evidence that Plaintiff has offered to suggest that he performed his job well are conclusory allegations from himself and two former co-workers and a sampling of congratulatory emails from his supervisors after he signed new business. While past positive performance reviews can be used to demonstrate pretext, *see, e.g.*, *Zimmermann*, 251 F.3d at 382-83, Plaintiff offers no evidence from SBS or any of his supervisors that he performed his job satisfactorily during the time immediately surrounding his termination. Plaintiff instead relies on declarations from his former co-workers, Mercado and Rose, who both stated in their declarations that they "believe" Plaintiff was an excellent salesperson. (Mercado Decl. ¶ 25; Rose Decl. ¶ 20, 34.) Additionally, Mercado and Rose generally describe that they were "unaware" of any problems with JL Media and "do not believe" that JL Media wanted Plaintiff taken off of its account. (Mercado Decl. ¶¶ 27-30; Rose Decl. ¶¶ 35-38.) The Court cannot conclude, on the basis of these conclusory and unsupported statements, that SBS's decision to terminate Plaintiff for unsatisfactory performance was pretextual.

Similarly, while Plaintiff contends that he adequately serviced JL Media (Baguer Decl. ¶¶ 152, 217-60), and hypothesizes that he would have been terminated sooner if JL Media had truly been displeased with his service (*id.* ¶¶ 215, 220), he offers nothing to affirmatively show that he adequately serviced the JL Media account or that JL Media did not want him removed. Thus, the affidavits of Plaintiff, Mercado, and Rose fail to offer the "concrete particulars" required in an affidavit to satisfy rule 56(e) and cannot create a disputed issue of material fact. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 451 (2d Cir. 1991).

Plaintiff's argument that he brought in the requisite number of new clients is similarly unsupported by the record, and therefore does not show that SBS's decision to terminate him is unworthy of belief. Specifically, SBS required that Plaintiff bring in three new business accounts in May 2003. (Baguer Dep. Tr. at 134:17-135:4.) Plaintiff asserts that he met that requirement by bringing in business from Maxx Connections, Garden State Auto, and Webster Auto Auction. (Baguer Decl. at ¶¶ 203-04.) However, as explained above, Plaintiff's own declaration contradicts this claim and the Court need not credit a plaintiff's self-serving, contradictory statements. *See Bickerstaff,* 196 F.3d at

9

455 ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony." (internal quotation marks and alterations omitted)).

Plaintiff also maintains that SBS's new-business rationale is pretextual because total overall sales, rather than new business, was "what was important." (*See* Pl.'s Mem. 14.) To the extent he relies on the declaration of Rose, she states only that "SBS treated obtaining new business as a goal and really just one of several different factors that SBS looked at in judging performance of account executives" and that "I do not *know of any* salespersons at SBS who was [sic] terminated by a failure to achieve new business goals; rather the key criteria was the revenues being generated on behalf of SBS." (Rose Decl. ¶¶ 31, 49 (emphasis added).) Mercado makes similar assertions. (*See* Mercado Decl. ¶¶ 21-22.) Neither Rose nor Mercardo's statements, therefore, contest that new business was one measure by which a salesperson was judged.

Additionally, Plaintiff repeatedly acknowledged that generating new business was part of his job. (*See* Baguer Dep. Tr. at 37:6-25.) Plaintiff also acknowledged that the decline in advertising expenditures after September 11, 2001 made it increasingly important to generate new business. (*See Id.* at 54:1-22.) In fact, he sent an email to Alvarez in January 2002 in which he made "[d]evelop[ing] $300,000 in new business" one of his resolutions. (Schwartz Aff. Ex. 13.) Alvarez sent an email to Plaintiff on January 27, 2003 stating that "[n]ew business will play a major role in our success in 2003." (*Id.* Ex. 14.) Estevez reiterated this sentiment in an email sent to all of the AEs on February 26, 2003. (*Id.* Ex. 15.) Similarly, Estevez sent Plaintiff a memorandum on April 4, 2003, copied to Alvarez and Dominguez, setting forth his sales goals in April through June of 2003. (Serritella Decl. Ex. 27.) It set goals for both existing and new business. (*Id.*) It also stated:

> You are expected to not only make your total budget, but more importantly to make the new business portion of your budget. . . . As the war develops and the economy continues to weaken, new business development will play a crucial role in our success. You are currently witnessing first hand budget cutbacks by your regular advertisers. I don't anticipate that this will change anytime soon. You must be proactive by knocking on new doors, seeing more people, and simply seeking new opportunities.

(*Id.*) Plaintiff acknowledges receiving this memorandum. (Pl.'s 56.1 ¶ 36.) Thus, although Plaintiff and several of his co-workers believe that total revenue is the most important measure of a salesperson's performance, they acknowledge that new business is a relevant criterion. Accordingly, Plaintiff's attempt to establish pretext by asserting that new-business generation was not an important job criterion is unavailing.

ii. Treatment of Other Employees

Plaintiff's allegations that SBS's non-Hispanic and non-Cuban employees were treated more favorably is also unsupported by the record. Many of the statements in the record on which Plaintiff relies do not create a material issue of fact because they offer nothing more than the opinion and beliefs of Plaintiff and his former co-workers that

some AEs were treated more favorably than others. Pretext cannot be shown through mere speculation or bare conclusory allegations. *See Bickerstaff*, 196 F.3d at 456 (holding that plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination" (internal quotation omitted)); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) (requiring that plaintiff allege specific facts and "provide more than conclusory allegations of discrimination" to survive a summary judgment motion). In addition to lacking specific factual allegations, many of his former co-worker's statements do not allege that the favorable treatment was on account of race, but only that some AE's were treated unfairly. (*See* Rose Decl. ¶ 17; Mercado Decl. ¶ 15 ).

Plaintiff's declaration describes two actions that allegedly show SBS's discrimination against Hispanic and Cuban employees. First, Plaintiff argues that SBS reassigned accounts away from him to non-Hispanic AEs. Second, Plaintiff argues that he was more harshly criticized and was eventually terminated for failing to meet expectations when others outside of his protected class were not. However, even though Plaintiff describes these events in sufficient factual detail, neither is sufficient to create a material issue of fact as to whether SBS's decision to terminate Plaintiff was pretextual.

Specifically, Plaintiff argues that the Court can infer that his termination was pretextual because SBS assigned other AEs more favorable accounts. Plaintiff alleges that in the late summer of 2002, the WPAT portion of the JL Media account was transferred to Blanche Joesten when other AEs continued to sell advertising for both stations. (Baguer Decl. at ¶ 38). However, Plaintiff acknowledges that less than six months later, in January of 2003, SBS officially split the sales staffs for WPAT and WSKQ pursuant to a policy instituted by Alvarez, confirming that accounts were split for valid business reasons. (Baguer Decl. at ¶ 50; Def.'s 56.1 ¶ 71.) Because Alvarez and Joesten are both Hispanic,[4] this further undermines any inference of discrimination. (Baguer Decl. at ¶¶ 38 n.10, 175; Def.'s 56.1 ¶ 14) Additionally, when describing how radio advertising sales work, Plaintiff himself explained that "[f]rom time to time" accounts are reallocated among salespersons for a host of permissible and nondiscriminatory reasons. (Baguer Decl. at ¶ 169.) A rational factfinder could not determine that either SBS's decision to split up the advertising sales between its two radio stations, or its decision to begin by splitting up one of its largest accounts, JL Media, was done for discriminatory reasons.

Similarly, while explaining his reduced sales in the period following the account split, Plaintiff alleges that "[o]thers, who were younger, non-Cuban, and non-Hispanic had stellar numbers as they were assigned to bona fide accounts." (Baguer Decl. ¶ 96.) In contrast, Plaintiff states that after the split, he was given "bogus" accounts to replace the business he lost. (Baguer Decl. ¶¶ 131, 183.) However, in spite of the extensive discovery that has taken place in this case, except for his own complaints, Plaintiff does not identify any specific AEs or what accounts — "good" or "bogus" — were reassigned to them.[5] Accordingly, this

---

[4] Although Plaintiff notes that this account eventually wound up being handled by Karen Cole, who is not Hispanic or Cuban, it was initially transferred to Joesten. (Baguer Decl. ¶ 175.)

[5] Additionally, the Court notes that SBS's review of its sales staff for the first quarter of 2003 would appear to suggest otherwise. Notably, Roberto Castillo and Moises Guerrero had strong quarters and Juan Almanzar had performed satisfactorily.

11

conclusory allegation does not create a material question of fact.

More generally, Plaintiff asserts that his termination was pretextual because other, non-Hispanic and/or non-Cuban, salespersons who failed to bring in the required amount of new business were not terminated. (Baguer Decl. at ¶ 129.) Despite the extensive discovery that has taken place in this case, however, the sole specific instance of unequal treatment that Plaintiff identifies is that when the spring 2003 sales projections indicated that both Plaintiff and Jackie Douglas would fail to meet their respective budgets, Douglas was given three additional months to make up the deficiencies while Plaintiff was required to make up the deficiency more quickly. (Baguer Decl. at ¶ 124.) This discrepancy does not show that Plaintiff's termination was pretextual for several reasons. First, in order to rely on disparate treatment to provide evidence of discrimination, Plaintiff must show "a reasonably close resemblance of the facts and circumstances of the Plaintiff's and the comparator's cases." *See Octobre v. Radio Shack Corp.*, No 07 Civ. 3311 (KMK), 2010 WL 850189, at *10 (S.D.N.Y. Mar. 11, 2010) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)). The report relied on by Plaintiff notes that part of the reason Douglas was behind was that she was out for six weeks at the beginning of the year because of a serious illness. (Schwartz Aff. Exs. 25, 28). Two employees cannot be considered similarly situated in an evaluation period where one was absent *half of the time* due to illness.

Second, allegations that Plaintiff was treated differently on account of his race are further undermined by the fact that Estevez prepared the report in question and is the one who suggested that Plaintiff be terminated if his performance did not improve. (Baguer Decl. ¶¶ 103, 110; Def. Ex. 28.) Courts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the effected employee. *See, e.g.*, *Eder v. City of N.Y.*, No. 06 Civ. 13013 (RWS), 2009 WL 362706, at *8 (S.D.N.Y. Feb. 12, 2009) (finding no inference of discrimination and awarding defendant summary judgment where plaintiff and her "immediate supervisor who assessed [her] performance and determined that it was lacking are members of the same protected class"); *Tucker v. N.Y.C.*, No. 05 Civ. 2804 (GEL), 2008 WL 4450271, at *5 (S.D.N.Y. Sep. 30, 2008) ("[A]ny inference of race discrimination is further undermined by the fact that all three superintendents under whom [plaintiff] worked as well as three of his four direct supervisors at the DOE were also African-American."). Like Plaintiff, Estevez is also Hispanic (Def. 56.1 ¶ 15), which suggests that the AE review was not discriminatory.

The remainder of Plaintiff's declaration contains similar conclusions unsupported by specific factual allegations, such as "[t]he favoritism towards those who were younger, non-Cuban and usually non-Hispanic is noticeable." (Baguer Decl. ¶ 123.) Because these portions of the record do not offer any specific evidence of employees outside his protected class being treated more favorably than him on account of race or national origin, the Court cannot conclude that they create a material question of fact as to whether SBS's decision to terminate him was a mere pretext for discrimination. *Cf., e.g.*, *Galimore v. City Univ. of N.Y. Bronx Cmty.*, 641 F. Supp. 2d 269, 285-86 (S.D.N.Y. 2009) (noting that without

---

(Schwartz Aff. Ex. 25.)  Castillo, Guerrero and Almanazar are all Hispanic. (Def.'s 56.1 ¶¶ 67, 69; Baguer Decl. at ¶ 16 n.5)

evidence that similarly situated employees outside her protected class were not terminated, plaintiff failed to meet her burden of showing that defendant's reasons for terminating her were pretextual); *Ford v. Consol. Edison Co. of N.Y.*, No. 03 Civ. 9587 (PAC), 2006 WL 538116, at *17 (S.D.N.Y. Mar. 3, 2006) ("Absent concrete, admissible evidence that similarly situated non-African-American employees were treated differently under identical circumstances, [the p]laintiff's discrimination claims must fail.").

### iii. Overall Personnel Shift

Plaintiff also argues that Defendant's explanation of his termination is pretextual because the termination was part of an overall shift at SBS away from a predominantly Hispanic staff to AEs that were generally white or African-American. Plaintiff alleges that SBS was shifting its sales force as part of an effort to attract more advertisers that do not specifically target a Hispanic audience. (Pl.'s Mem. at 13; Mercado Decl. ¶ 36; Rose Decl. ¶ 40) Although thorough statistical information about an employer's hiring practices could conceivably show a pattern sufficient to support an inference of discrimination, Plaintiff has not made such a showing here.

Similar to the allegations about unfair treatment discussed above, Plaintiff's assertions that SBS was shifting away from a predominantly Hispanic sales staff fail because they are based on conclusory allegations unsupported by specific facts. Additionally, the record indicates that as of the year 2000, 88% of the employees at SBS New York were Hispanic. (Def.'s 56.1 ¶ 3.). Plaintiff has failed to produce any evidence, aside from his conclusion, that the composition of the sales force is changing.

In addition, the substantially diverse makeup of SBS's workforce and management strongly suggests that its decision to terminate Plaintiff was not racially motivated. *See Liburd v. Bronx Lebanon Hosp. Ctr.*, 07 Civ. 11316 (HB), 2009 WL 900739, at *5 (S.D.N.Y. Apr. 3, 2009) (finding plaintiff failed to state a *prima facie* case in part because "statistics evince[d] substantial racial diversity among the employees comparable to Plaintiff and negate[d] any inference of discrimination that otherwise might have been created"). This is particularly so in light of the fact that both SBS's founder and its current chairman, president and CEO were both born in Cuba. (Def.'s 56.1 ¶ 2.) Moreover, Estevez and Alvarez, Plaintiff's former managers and the individuals who criticized Plaintiff's work and were involved in the decision to terminate him, are both Hispanic and Alvarez is Cuban. (*Id.* ¶¶ 14-15.) Even assuming that SBS was attempting to target a broader advertising base, the Court cannot accept Plaintiff's conclusory assertions as showing that SBS was discriminating against its Hispanic AEs.

### iv. Failure To Raise an Inference of Discrimination

Even if the Court were to conclude that Plaintiff had raised a factual issue as to whether his failure to generate new business was one of the true reasons for which he was terminated, the scant evidence supporting this proposition would be insufficient to support an inference of discrimination. A plaintiff's production of only minimal evidence that the employer's proffered reason for termination was not the real reason, in conjunction with the plaintiff's *prima facie* case, may or may not be enough to support an inference of discrimination and reach a jury. *See James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000).

13

The Court still must answer the question of "whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *Id.* at 157. To determine whether the evidence of pretext and the *prima facie* case support an inference of discrimination, the Court must examine "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case." *Id.* (internal quotation marks and alterations omitted).

Considering (1) the substantial documentary evidence in the record, including ample correspondence with Plaintiff evidencing SBS's focus on and need for new business; (2) Plaintiff's failure to substantiate his claim that he brought in the requisite amount of new business; (3) Plaintiff's failure to satisfy one of his most important clients, JL Media, and that client's request that he be removed; (4) the active role many individuals in the same protected class played in the decision to terminate Plaintiff; and (5) the substantial amount of individuals in the same protected class working at all levels of SBS, the record taken as a whole cannot support an inference of discrimination.

\* \* \*

Accordingly, considering all of the evidence in the record and granting Plaintiff all of the inferences to which he is entitled, the Court finds that Plaintiff has failed to meet his burden in adducing sufficient evidence to support a finding that Plaintiff was terminated for discriminatory reasons. Defendant's motion for summary judgment is therefore granted as to Plaintiff's federal and state race and national origin discrimination claims.

### C. Age Discrimination

#### 1. Applicable Law

Plaintiff also brings claims for age discrimination under the ADEA, which makes it "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

Recently, in *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2349 (2009), the Supreme Court clarified the standard for prevailing on ADEA claims. The Court held that, unlike claims under Title VII, where plaintiffs must only establish that an impermissible consideration was "a motivating factor," to prevail under the ADEA, "the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." *Gross*, 129 S. Ct. at 2349, 2351. Although *Gross* expressly declined to address whether the *McDonnell Douglas* framework is appropriate for ADEA claims, 129 S. Ct. at 2349 n.2, the Second Circuit continues to apply it. *Gorzynski*, 596 F.3d at 106. Accordingly, the Court will analyze Plaintiff's claim under the traditional burden shifting framework described above.

#### 2. *McDonnell Douglas* Applied

##### a. Step One: *Prima Facie* Case

As in the Title VII context, to establish a *prima facie* case of age discrimination, Plaintiff must show "(1) that []he was within the protected age group, (2) that []he was qualified for the position, (3) that []he experienced [an] adverse employment action, and (4) that such action occurred

14

under circumstances giving rise to an inference of discrimination." *Gorzinsky*, 596 F.3d at 107. As described above, Plaintiff unquestionably meets the first three factors as he is over 40 years old, is qualified for the position, and was terminated.

Although it is a low bar to establish a *prima facie* case, the Court finds that Plaintiff has not met the minimal requirement necessary to establish that he was terminated under circumstances that support an inference of age discrimination. Plaintiff argues that the Court can infer discrimination because his replacement was younger than he, older AEs were treated less favorably than younger AEs, and the SBS sales staff was becoming "substantially younger." (Pl.'s Mem. 12-13.) The Court will address each argument in turn.

      i. Plaintiff's Replacement

Plaintiff was 51 years old when SBS terminated him and replaced him with Gina Golden, who was then 43 years old. (Baguer Decl. ¶ 6, 151). Based on this eight-year age difference, Plaintiff argues that the Court can infer that he was discharged for discriminatory reasons. Both Plaintiff and his replacement were over 40 years old and thus in the ADEA's protected class, but this fact alone is not dispositive. *See O'Connor*, 517 U.S. at 312.

"Generally, a plaintiff's replacement by a significantly younger person is evidence of age discrimination." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000). Although there is no bright-line standard for determining what constitutes "significantly younger," courts in this circuit have established certain guideposts. *See Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001) (concluding that a 22-year age difference between rival job applicants supports an inference of age discrimination); *Kaplan v. Beth Israel Med. Ctr.*, No. 07 Civ. 8842 (RPP), 2010 WL 1253967, at *5 (S.D.N.Y. Mar. 31, 2010) (concluding that a three-year age difference is insufficient to create an inference of discrimination). After undertaking an extensive, nationwide survey of cases, the Sixth Circuit concluded that generally "most circuits ha[ve] held that age differences of less than ten years are not significant enough to make out the fourth part of the age discrimination prima facie case." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336-39 (6th Cir. 2003) (collecting cases). Because the difference between Plaintiff and his replacement is only eight years, the Court finds that this difference, particularly when considered in light of the other evidence, does not support an inference of discrimination.

Any inference of discrimination based on the age difference between Plaintiff and his replacement is further weakened because Plaintiff was already in the protected class when hired by SBS. Being in the protected class when hired undermines any inference of age discrimination. *See Kaplan*, 2010 WL 1253967, at *5; *O'Connor v. Viacom Inc./Viacom Int'l Inc.*, No. 93 Civ. 2399 (LMM), 1996 WL 194299, at *7 (S.D.N.Y. Apr. 23.1996) ("[T]he inference of discrimination is much weaker where the plaintiff employee is well within the protected class when first hired.") (citing *Stanojev v. Ebasco Servs.*, Inc., 643 F.2d 914, 921 (2d Cir. 1981)). Because Plaintiff was 45 years old when SBS hired him in January of 1996, this suggests that his termination in 2003 was not motivated by his age.

Additionally, the age of many of Plaintiff's supervisors undermines any

15

inference of discrimination. As in the Title VII context, "invidious discrimination is unlikely where, as here, the person who made the termination decision . . . is in the same protected class" as the employee. *See Elfenbein v. Bronx Lebanon Hosp. Ctr.*, No. 08 Civ. 5382 (RMB), 2009 WL 3459215, at *7 (S.D.N.Y. Oct. 27, 2009). Although Estevez was only 38 years old when Plaintiff was terminated (Estevez Dep. Tr. at 25:7-8); Alvarez was 45 (Def. 56.1 Stmt. ¶ 13); Levy of JL Media, who asked that Plaintiff be taken off of his account, was 61 (Schwartz Aff. ¶ 3); and Davis was 49 years old (Schwartz Aff. ¶ 17).

Plaintiff's claim that his replacement is paid less than him also does not support an inference that he was terminated for discriminatory reasons. High salary and age may frequently be related, but so long as it does not have a disparate impact on older workers, employers may make decisions based on financial considerations without running afoul of the ADEA. *See Bay v. Times Mirror Magazines, Inc.*, 936 F.2d 112, 117 (2d Cir. 1991).

### ii. Different Treatment

Like Plaintiff's allegation that non-Hispanic and non-Cuban employees were treated more favorably than he, his allegation that younger employees received preferential treatment is similarly unsupported by the record. Plaintiff does not identify any specific AEs, their ages, or which more favorable accounts they were assigned. He therefore cannot create an inference of discrimination from conclusory allegations. *See Burchette v. Abercrombie & Fitch Stores, Inc.*, No. 08 Civ. 8786 (RMB), 2010 WL 1948322, at *8 (S.D.N.Y. May 10, 2010).

### iii. Overall Personnel Shift

Plaintiff also asserts that there is an inference of discrimination because the sales staff at SBS was becoming substantially younger. (Pl. Mem. 13.) In support of this, Plaintiff alleges that he, Rose, and Mercado were all replaced by younger individuals. (Mercado Decl. ¶ 36; Rose Decl. ¶ 43.) In addition to not specifically identifying or describing how old the replacements were, however, neither Mercado nor Rose was terminated. (Mercado Decl. ¶ 14; Rose Decl. ¶ 15.) No rational factfinder could conclude that SBS was discriminating on the basis of age based on these facts.

### b. Step Two: Non-Discriminatory Reasons for Plaintiff's Termination

Although the Court concludes that Plaintiff failed to establish all the elements of a *prima facie* case of discrimination, the Court also finds that Defendant has carried its burden of articulating legitimate and nondiscriminatory reasons for terminating Plaintiff, thus satisfying the second prong of the *McDonnell Douglas* framework. As explained above, when discussing Plaintiff's race and national origin discrimination claims, SBS terminated Plaintiff for unsatisfactory performance, a sufficient nondiscriminatory reason. *See supra* part II.B.2.b.

### c. Step Three: Pretext

While the Court finds that Plaintiff has failed to satisfy the first step of *McDonnell Douglas*, it notes that the discussion of Plaintiff's unsatisfactory job performance is also applicable to Plaintiff's ADEA claim. Thus, for essentially the same reasons that Plaintiff failed to make a *prima facie* showing that he was terminated under circumstances that support an inference of

discrimination, and that he failed to show SBS's decision to terminate him was a pretext for race or national-origin discrimination, the Court finds that Plaintiff has failed to create a material issue of fact as to whether SBS's rationale for terminating him was pretextual.

### D. New York City Human Rights Law Claims

In 2005, New York City passed The Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005), which clarified that "employment discrimination claims under the NYCHRL are to be reviewed independently from, and more liberally than, their federal and state counterparts." *See Fowler v. Scores Holding Co., Inc.*, 677 F. Supp. 2d 673, 682 (S.D.N.Y. 2009); *accord Loeffler*, 582 F.3 at 278. Accordingly, when determining whether a plaintiff's claim survives summary judgment under the NYCHRL, this Court must conduct an independent analysis. *See Loeffler*, 582 F.3d at 278. Even with this recent clarification, however, courts in this district have continued to apply the Title VII burden-shifting framework. *See, e.g.*, *Bernard v. J.P. Morgan Chase Bank N.A.*, No. 08 Civ. 4784 (THK), 2010 WL 423102, at *9 (S.D.N.Y. Feb. 5, 2010); *Fowler*, 677 F. Supp. 2d at 681-84.

After conducting a thorough and independent analysis of Plaintiff's NYCHRL claims, the Court concludes that Plaintiff has failed to create a material issue of disputed fact as to whether he was discriminated against on the basis of his race, national origin, or age. Nothing in the 2005 revisions to the NYCHRL changed the standard for creating a disputed issue of material fact under Rule 56. Thus, even under the "more liberal" standard espoused by the NYCHRL, the Court finds that Plaintiff has failed to create a disputed issue of material fact as to whether Defendant's proffered reasons for terminating him are pretextual.

### E. Remaining Claims

#### 1. Negligent Supervision

In accordance with the Court's conclusion that SBS's decision to terminate Plaintiff was not discriminatory, Plaintiff's claim for negligent supervision fails. An essential element of a claim for negligent supervision is that the defendant's employee caused harm. *See Newton v. City of N.Y.*, 07 Civ. 6211 (SAS), 2010 WL 323050, at *8 (S.D.N.Y. Jan. 27, 2010). Because the Court finds that Plaintiff's direct supervisors did not unlawfully discriminate against him, there is no untoward conduct for which to hold SBS liable and SBS is entitled to summary judgment on this claim.

#### 2. Breach of Implied Covenant of Compliance With the Law

The Court is unsure what cause of action Plaintiff seeks to invoke in Count 8, labeled "Breach of Implied Covenant to Comply with the Law." (Am. Cmpl. 18.) No cause of action by that name appears to exist in New York law. Even if it did, because Plaintiff has failed to adduce any evidence that Defendant violated the law, Defendant would be entitled to summary judgment on such a claim.

#### 3. Unpaid Commissions and Reassignment of Accounts

Defendant is also entitled to summary judgment on Plaintiff's remaining claims for breach of contract, quantum meruit, breach of the covenant of good faith and fair

dealing, and an unspecified claim under New York Labor Law.[6] Although styled as four separate causes of action, Plaintiff essentially complains that SBS failed to pay him commissions due after it terminated him.

### a. Breach of Contract

Count 6 of the Complaint alleges that "plaintiff and defendant . . . entered into a contract pursuant to which plaintiff was to receive commissions totaling five (5%) to ten (10%) [percent] of revenues associated with the accounts assigned to plaintiff, for which he generated sales, both while plaintiff remained an employee of defendant and thereafter." (Am. Cmpl. ¶ 77.) Having produced no evidence of such a contract in discovery, Plaintiff now argues that the SBS Employee Handbook constituted a written employment contract. Notably, the handbook addresses what will happen when a sales person leaves the company: if he resigns, he will receive thirty days of commission, and if he is terminated for cause, he will receive no further compensation. (*See* Schwartz Aff. Ex. 56 at 5.) Defendant admits both that he was aware of this policy and that he received commissions for thirty days after his termination. (*See* Baguer Dep. Tr. 208:10-209:16.) Accordingly, Plaintiff received at least what he was entitled to under the Employee Handbook. Thus, if the handbook constituted an employment contract, SBS did not breach it.[7]

### b. Breach of Implied Covenant of Good Faith and Fair Dealing

Judge Karas dismissed Plaintiff's claim for breach of the implied covenant of good faith and fair dealing with respect to the reallocation of Plaintiff's accounts. *See Baguer*, 2007 WL 2780390, at *11. Remaining to be resolved is Plaintiff's claim under this theory for unpaid commissions. Having now considered the alleged contract on which Plaintiff bases his claim, however, the Court finds that Defendant is entitled to summary judgment on this claim as well.

> In general, under New York law, a duty of good faith and fair dealing is implicit in every contract. A claim of breach of the duty of good faith and fair dealing, however, will be dismissed as redundant where the conduct allegedly violating the implied covenant is a predicate also for a claim for breach of an express provision of the contract.

*Kamfar v. New World Restaurant Group, Inc.*, 347 F. Supp. 2d 38, 52 (S.D.N.Y. 2004) (internal quotation marks and alterations omitted); *accord Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002). Accordingly, even if the Employee Handbook created a contract between the parties, Plaintiff's good faith and fair dealing claim regarding commissions would be duplicative of his breach of contract claim.

---

[6] Judge Karas dismissed Plaintiff's claims for tortious breach of contract and promissory estoppel by order dated September 20, 2007. (Doc. No. 22.)

[7] Although not squarely addressed in the parties' papers, the record discloses that SBS fired Plaintiff for "poor performance." (*See* Schwartz Aff. Ex. 38 (Email from Carey Davis to Julie Dominguez, dated July 16, 2003) ("Mike Plaintiff will be terminated from SBS due to poor performance. . . . Can you please put in writing M. Plaintiff's termination cause and terms for the HR records."); *accord* Def.'s 56.1 ¶ 92.) Even if Plaintiff was terminated without cause, he has not presented evidence of a contractual right to compensation in such circumstances.

c.  Quantum Meruit

Defendant is also entitled to summary judgment on the claim for quantum meruit. If the employment agreement was a binding contract, no quasi-contract claim can be asserted. *See Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610 (2d. Cir. 1996). Otherwise, to recover under a quasi-contract theory, a plaintiff must establish, *inter alia*, an expectation of compensation. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). As mentioned above, the Employee Handbook expressly states the terms under which commissions will be paid to employees who are terminated. (*See* Schwartz Aff. Ex. 56 at 5.) Plaintiff himself testified that he was aware of the terms of the employee handbook regarding commissions due upon termination and that he received commissions under the more generous of the two provisions. (Baguer Dep. Tr. at 208:10-209:16.) Nor is there any evidence in the record that anyone at SBS represented to Plaintiff that, should he be terminated, his treatment would be different. Thus, Plaintiff has not established a disputed issue of fact with respect to his quantum meruit claim. Then-District Judge Chin reached the same conclusion in *DeSantis v. Deutsche Bank Trust Co. Americas, Inc.*, where he stated:

> Here, there is an express provision in the Deutsche Bank Handbook governing the payment of bonuses. The HR Policies in the Handbook make clear that any payment of bonuses is in the sole discretion of the Bank and that to receive a bonus, an employee must be employed by the Bank on the date bonuses are paid. DeSantis testified that he understood that to be the Bank's bonus policy. He further acknowledged that he did not have a written agreement with the Bank guaranteeing him a bonus, nor did anyone at the Bank make him any such guarantee. Given the express language of the Bank's bonus policy and DeSantis's lack of a contractual right to a bonus, DeSantis has not established an issue of material fact with respect to his quasi-contract claims. Accordingly, summary judgment is granted in favor of defendants on DeSantis's implied contract and quantum meruit claims.

501 F. Supp. 2d 593, 601 (S.D.N.Y. 2007) (citations omitted). Accordingly, the Court grants summary judgment in Defendant's favor on this claim as well.

d.  Violation of New York Labor Law

Finally, while Plaintiff purports to bring a claim under the New York Labor Law for commissions claimed to be owed, he does not, in the complaint or his moving papers, identify any specific section of the New York Labor Law that would provide him the relief he seeks.[8] Nevertheless, Plaintiff believes that he is entitled to an unascertained amount of commissions on accounts that he sold but had not been collected by SBS on the date of his termination. (Baguer Dep. Tr. 210:4-211:23.) "[P]laintiff cannot," however, "assert a statutory claim for wages under the Labor Law if he has no enforceable contractual right to those wages." *Tierney v. Capricorn Investors, L.P.*, 592 N.Y.S.2d

---

[8] Although Plaintiff references sections 197 and 198 of the New York Labor Law in his brief (Pl.'s Mem. 23-24), those sections merely allow employees who prevail on claims to recover unlawfully withheld wages to receive civil penalties and costs, but do not provide substantive rights. *See Vysovsky v. Glassman*, No. 01 Civ. 2531 (LMM), 2007 WL 3130562, at *17 (S.D.N.Y. Oct. 23, 2007).

19

700, 703 (1st Dep't 1993). Accordingly, the Court grants summary judgment on Plaintiff's Labor Law claims as well.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is directed to terminate the motion located at docket number 43 and to close this case.

SO ORDERED.



RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

Dated: July 12, 2010
New York, New York

\* \* \*

Plaintiff Michael Baguer is represented by Jerry S. Goldman and James R. Serritella, Anderson Kill & Olick, PC, 1251 Avenue of the Americas, New York, New York 10020. Defendant Spanish Broadcasting System, Inc. is represented by William C. Zifchak and Jordan B. Schwartz, Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022.

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/12/10
```